## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

BRENDA L. WALKER,       :
                            :

     Plaintiff,        :
                            :       CIVIL ACTION NO.
     v.             :       1:12-cv-02586-TWT-RGV
                            :

CAROLYN W. COLVIN,      :
*Commissioner of Social Security*     :
                            :
     Defendant.     :

## <u>ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION</u>

Attached is the Final Report and Recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(b), and this Court's Local Rule 72.1. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the district court.  If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Report and Recommendation with objections, if any, to the district court after expiration of the above time period.

**IT IS SO ORDERED**, this 17th day of May, 2013.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| BRENDA L. WALKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:12-cv-02586-TWT-RGV |
| | : | |
| CAROLYN W. COLVIN, | : | |
| *Commissioner of Social Security* | : | |
| | : | |
| Defendant. | : | |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This is an action to review the determination by the Commissioner of Social Security ("the Commissioner") that claimant Brenda L. Walker ("claimant") is not entitled to supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383f.  For the reasons set forth herein, it is **RECOMMENDED** that the Commissioner's decision denying claimant SSI benefits be **REVERSED** and this case be **REMANDED** for further proceedings.

## I.  PROCEDURAL HISTORY

Claimant protectively filed an application for SSI on July 18, 2008,[1] alleging

---

[1] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits."  Hunt v. Astrue, No. 4:11–CV–01242, 2012 WL 6562157, at *1 n.1 (M.D. Pa. Dec. 17, 2012).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed."  Id.

disability commencing April 1, 2008, due to breast cancer, fibromyalgia, and depression.  (Tr.[2] at 105-111, 128, 133).  Claimant's SSI application was denied initially on September 17, 2008, and on reconsideration on May 11, 2009.  (Tr. at 76-86).  Claimant then requested a hearing before an Administrative Law Judge ("ALJ"), see (Tr. at 89), and a hearing was held before ALJ Sherianne Rote on October 7, 2010, see (Tr. at 27-57).  On October 21, 2010, the ALJ issued a decision denying claimant's SSI application upon finding that she had not been under a "disability" as defined by the Act since July 18, 2008.  (Tr. at 10-26).  Claimant sought review by the Appeals Council, (Tr. at 8-9), and on July 14, 2012, the Appeals Council denied claimant's request for review, (Tr. at 1-7), making the ALJ's decision the final decision of the Commissioner.

Claimant appealed the decision to the district court on July 25, 2012, seeking review of the Commissioner's decision.  [Doc. 1].  The matter is now before the Court upon the administrative record and the parties' briefs and is ripe for review pursuant to 42 U.S.C. § 1383(c).

---

[2] See [Doc. 5] and its attachments for the electronic Certified Administrative Record ("eCAR"), hereinafter referred to as ("Tr. at __").  With the exception of the eCAR, which is cited according to the actual transcript page number shown on the bottom of the record, the cited document and page numbers in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to this Court's electronic filing database (CM/ECF).

## II.  ISSUES

Claimant has raised the following issues in this case:

1.     Whether the ALJ properly weighed all of the medical evidence
       in making her residual functional capacity ("RFC") assessment;

2.     Whether the ALJ erred by failing to properly assess claimant's
       credibility;

3.     Whether the ALJ erred by failing to properly evaluate the lay
       witness evidence;

4.     Whether the ALJ erred in failing to order a consultative
       psychiatric examination; and

5.     Whether the ALJ's determination at step five of the sequential
       evaluation that claimant could perform other work in light of her
       RFC, age, education, and past work experience is supported by
       substantial evidence.

[Doc. 8].

## III.  STATEMENT OF FACTS

### A.     Claimant's History

Claimant was born on April 17, 1959, and she was 49 years old when she

applied for SSI benefits and 51 years old at the time the ALJ issued her decision

denying claimant benefits.  (Tr. at 20, 34, 105, 127).  Claimant has a limited education

in that she completed the ninth grade, and she has past relevant work experience as

a dishwasher, a waitress, and in food preparation.  (Tr. at 36-39, 52, 119-22, 132, 138,

209).

B.    **Medical Evidence**

Claimant's medical history shows that she has received treatment for a variety of physical and mental ailments.  See generally [Doc. 5].[3]  Specifically, the record reflects that claimant sought treatment from Priscilla R. Strom, M.D. ("Dr. Strom"), in June of 2004 based on a referral for a mass in her left breast, and she was subsequently diagnosed with stage IIB breast cancer, for which she underwent a left modified radical mastectomy and right subclavian port placement in July of 2004. (Tr. at 224-48, 275-76).

On July 26, 2004, claimant saw Richard Carter, M.D. ("Dr. R. Carter"), with Atlanta Cancer Care, for a new patient evaluation.  (Tr. at 250-54, 360-62).  Dr. R. Carter noted that claimant was status post modified radical mastectomy, that she had one positive node apart from her tumor, and that she was present to discuss adjuvant therapy.  (Tr. at 250).  Dr. R. Carter's overall impression at this time was that claimant was a healthy female who was status post mastectomy, (Tr. at 251), and he recommended that claimant begin hormonal therapy and aggressive chemotherapy, "consisting of Adriamycin and Cytoxan in combination, followed by Taxol times four cycles" due to the positive lymph nodes and in order to maintain

---

[3] The following summary of the medical evidence is sufficient for the Court's analysis of the relevant issues in dispute and to provide a clearer understanding of claimant's medical history.

remission.  (Tr. at 250, 252).  Thereafter, from August of 2004 through December of 2004, claimant underwent eight courses of chemotherapy, four courses of Adriamycin and Cytoxan, and four courses of Taxol, <u>see</u> (Tr. at 363-79), and she reported to Dr. R. Carter that she was doing well with the exception of ringing in her ears, headaches, fatigue, generalized pain and weakness, nausea and some vomiting, and some hair loss, <u>see</u> (<u>id.</u>).

On January 6, 2005, claimant saw Dr. R. Carter for a follow-up examination regarding her breast cancer, at which time she reported that she was doing well and feeling good.  (Tr. at 380-81).  Dr. R. Carter recommended that claimant have the port removed, that she proceed with breast reconstruction, and that she continue taking Femara for hormone therapy.   (Tr. at 381).   Additionally, claimant's prescriptions for Lortab and Xanax were renewed.  (<u>Id.</u>).

On February 3, 2005, claimant returned to Dr. Strom's office for a follow-up appointment and it was noted that claimant had received eight courses of chemotherapy with four courses of Adriamycin and Cytoxan followed by Taxol and that she was currently on Femara as well as anxiety-related medications.  (Tr. at 221-23).  Dr. Strom also noted that claimant denied any back or hip pain, did not have any specific joint complaints, did have some mild arthralgias while on chemotherapy, and that her main complaint was that she still had numbness on the

lateral aspect of her chest wall and under her arm from the mastectomy. (Tr. at 222). Upon physical examination, Dr. Strom observed that claimant looked well, that her left chest wall was without any evidence of recurrence, that her right breast had some fibrocystic nodularity but nothing suspicious, and that she still had a port in place in her right chest wall. (Tr. at 222-23). Dr. Strom's impression at this time was fibrocystic disease, breast cancer, and anxiety, and she decided to leave the port in place in case it was needed during reconstructive surgery. (Tr. at 223). Dr. Strom instructed claimant to follow up with her in about six months or as needed. (Id.).

On this same day, claimant also saw Arden L. Hothem, M.D., F.A.C.S. ("Dr. Hothem"), with Northeast Georgia Plastic Surgery Associates, for consideration of left breast reconstruction, and he indicated that claimant agreed to go forward with TRAM flap reconstruction. (Tr. at 249). Claimant returned to Dr. R. Carter's office on February 8, 2005, at which time it was noted that she had been receiving Lortab and Xanax from Dr. R. Carter as well as from another doctor. (Tr. at 383-85). During this appointment, claimant complained of lower extremity pain and she was prescribed Motrin and her medication was changed to Tamoxifen in order to try to decrease her bone pain. (Id.).

Claimant returned to Dr. R. Carter for a follow-up appointment on March 1, 2005, at which time she reported doing well, with the exception of slight discomfort

in her left arm.  (Tr. at 386-88).[4]  However, during her follow-up appointment with Dr. R. Carter on June 7, 2005, claimant reported suffering from hot flashes, it was noted that Femara was stopped secondary to bone pain and that Tamoxifen had been stopped secondary to hot flashes, and she was therefore given samples of Arimidex with instructions to follow up in two weeks to discuss side effects.  (Tr. at 393-96).  On June 29, 2005, claimant advised Dr. R. Carter that she was doing well and it was noted that she was tolerating Arimidex.  (Tr. at 391-93).

On August 4, 2005, claimant returned to Dr. Strom for a follow-up appointment, at which time it was noted that a review of claimant's systems was "pretty negative."  (Tr. at 217-19).  Claimant reported suffering from migraines, but Dr. Strom noted that they had not been debilitating.  (Tr. at 218).  Dr. Strom noted that claimant had not had any back or joint pain and that her "only symptom really of note [was] that she complain[ed] of some swelling in her hands and her ankles." (Id.).  Dr. Strom observed that claimant looked well, that her left chest wall was without evidence of disease, that her right breast had some fibrocystic changes but nothing suspicious, that there was no tenderness over her back or hips, that there was no visible edema in her hands or feet, and that she was alert and oriented with no gross focal motor deficits.  (Id.).  At this time, Dr. Strom advised claimant to

---

[4] On May 13, 2005, claimant saw Dr. Strom in order to have the port in her right chest wall removed, which was performed "easily."  (Tr. at 220).

continue to see Dr. R. Carter every three months and that she would see her in a year.  (Tr. at 219).

On September 13, 2005, claimant sought treatment at Hayesville Family Practice and she saw Carol Mixon, FNP-BC ("Mixon"), for refills of her regular medications, which were noted as Ibuprofen, Spironolactone, Zoloft, Fioricet, Clonazepam, Zocor, and Lortab.[5]  (Tr. at 309-10).  Mixon, under the supervision of Laneau Hayes, M.D. ("Dr. Hayes"), noted claimant's breast cancer history and that she had been experiencing "some increased swelling in her hands, face and feet." (Tr. at 309).  Mixon also noted that claimant needed a B-12 injection due to her deficiency and that she had completed her chemotherapy and radiation, but still had a "good bit of pain in her legs."  (Id.).  Mixon further noted that claimant's depression and anxiety were stable at this time and that her edema was possibly related to her Femara treatment.  (Id.).

Claimant saw Dr. R. Carter on September 28, 2005, for a follow-up appointment during which she reported that she was doing well, but that she was having joint pain and swelling in her hands.  (Tr. at 389-90).  Dr. R. Carter continued claimant on Arimidex "because of the importance of hormonal control" and noted

---

[5] While it appears that this appointment was a follow-up appointment, this is the first treatment note from Hayesville Family Practice contained in the eCAR.  See generally [Doc. 5].

8

that there was no swelling in her hands appreciated upon physical examination and that her mammogram performed in March of 2005 read as benign.  (Tr. at 390).

On November 7, 2005, claimant saw Mixon for a follow-up on her dyslipidemia, depression, and B-12 deficiency.  (Tr. at 308).  Mixon noted that claimant had been receiving B-12 injections once a month and that she was taking Lortab to help relieve severe leg pain related to her Femara cancer treatment.  (Id.). During this appointment, claimant complained of tenderness in her left ear area that radiated down to the left side of her neck and Mixon observed mild swelling of her hands and feet related to her Femara treatment.  (Id.).  Claimant's medicinal regimen was adjusted and she was instructed to follow up in two months.  (Id.).  However, claimant returned on November 28, 2005, for a B-12 injection and Mixon noted that she was scheduled for breast reconstruction surgery the following week, was "feeling well with no complaints," and that her depression was stable.  (Tr. at 307).

On December 2, 2005, Dr. Hothem performed TRAM reconstructive surgery on claimant's left breast, see (Tr. at 277-79), and she was discharged on December 6, 2005, with instructions to remain active at home by walking, but no jogging, and that she was not to lift any object greater than 10 to 15 pounds, see (Tr. at 280). Following the surgery, claimant returned to Hayesville Family Practice for a follow-up appointment on January 10, 2006, at which time it was noted that she was having

significant pain in her breast and abdomen due to the reconstructive surgery.  (Tr. at 306).  Claimant was observed as moving very slowly and appeared uncomfortable remaining in one place for a long period of time, though the incisions on her breast and abdomen were noted as healing "nicely."  (Id.).

On January 17, 2006, claimant saw Dr. R. Carter for a follow-up appointment, at which time she complained of generalized pain.  (Tr. at 397-99).  Dr. R. Carter observed that claimant's incisions were intact and that her blood pressure was under good control and he instructed her to continue Arimidex and return in three months.  (Id.).  Claimant saw Mixon on February 8, 2006, at which time she complained of ringing in her ears, see (Tr. at 305), and she returned on March 6, 2006, reporting that she was having trouble sleeping "related to her generalized joint and muscle pain that she has at night," (Tr. at 304).  Claimant's medications were refilled on April 7, 2006, see (Tr. at 303), and she saw Dr. R. Carter on April 18, 2006, at which time Dr. R. Carter observed a "large palpable mass at the 11 o'clock to 1 o'clock position in the reconstructed left chest wall," and ordered a mammogram and bone density test, (Tr. at 400-02)  On April 20, 2006, claimant saw Mixon and complained of muscle and joint pain and her medicinal regimen was adjusted.  (Tr. at 302).

On May 1, 2006 claimant was administered a B-12 injection and her medications were refilled, see (Tr. at 300), and a right-sided mammogram was

performed the following day, which showed "no convincing imaging evidence of malignancy," <u>see</u> (Tr. at 327 (emphasis omitted)).  Claimant saw Mixon on May 3, 2006, at which time claimant was still having chronic extremity pain and her history of depression was noted as well.  (Tr. at 299, 301).  Thereafter, claimant underwent a bone density test and the report dated May 4, 2006, revealed a diagnosis of osteopenia, with a mildly increased risk for fracture.  (Tr. at 320).

On June 16, 2006, claimant returned to Hayesville Family Practice, at which time it was noted that she was tearful and reported that "everything [was] wrong." (Tr. at 297).  During her follow up appointment on June 22, 2006, claimant reported that she was hurting all over and that her pain began after she started Femara.  (Tr. at 296).  Mixon noted that claimant suffered from depression, which she believed was "somewhat better," but that claimant's recent lab work showed severe dyslipidemia.  (<u>Id.</u>).[6]

---

[6] On July 4, 2006, Mixon sent a "To Whom It May Concern" letter to the Social Security Administration ("SSA"), stating in relevant part as follows:

> [Claimant] is disabled due to her recent diagnosis of breast cancer with subsequent mastectomy and breast reconstruction.  She is on Femara oral medication for prevention of breast cancer, which causes chronic generalized pain.  She is also suffering from depression related to her recent diagnosis and inability to get around as usual.

(Tr. at 328).

11

Claimant saw Mixon on September 5, 2006, for her routine follow up and she reported that she was still having generalized myalgia and joint pain, which Mixon again noted as secondary to her Femara hormone treatment. (Tr. at 294). Mixon also noted that claimant was somewhat anxious and she adjusted her medicinal regimen at this time. (Id.).[7] During her October 31, 2006, appointment, claimant reported to Mixon that she was having problems in her marriage and would be staying with her mother, and Mixon observed a "slightly depressed affect" and adjusted her medications to help with her insomnia. (Tr. at 293).[8]

Claimant was administered a B-12 injection on November 30, 2006, see (Tr. at 292), and on December 18, 2006, she advised Mixon that her insurance refused to pay for her osteopenia and cholesterol medications and that she was having significant back pain, (Tr. at 291). Claimant also reported that she was still having trouble sleeping and it was observed that she may have developed shingles. (Id.). Claimant returned on January 11, 2007, for a B-12 injection, see (Tr. at 290), and on February 12, 2007, she reported to Dr. R. Carter that she was doing "fairly well,"

_____

[7] On October 17, 2006, claimant saw Dr. R. Carter for a follow-up evaluation, at which time he observed that the fullness in claimant's left breast seemed worse. (Tr. at 403-05).

[8] A colonoscopy was performed on claimant on November 16, 2006, see (Tr. at 257), and one rectal polyp was removed and biopsied, which was hyperplastic, see (Tr. at 326).

12

though he observed that the fullness in her left breast still seemed worse and that she had slight edema in her fingers, (Tr. at 406-08).

On April 10, 2007, claimant reported to Mixon that she was having some hot flashes, fatigue, generalized myalgia, and joint pain, and her medications were refilled at this time.  (Tr. at 289).  A mammogram was performed on claimant on May 7, 2007, which resulted in benign findings, see (Tr. at 259).  On May 9, 2007, claimant presented to Rockdale Medical Center with complaints of head and neck pain, which she rated a seven on a scale of one to ten, (Tr. at 262-65).  However, imaging of claimant's spine from May 10, 2007, showed that the "cervical segments [were] in good alignment and the disc spaces preserved in height" and that there was "no cervical fracture or subluxation or other acute abnormality."  (Tr. at 266).[9]

On July 25, 2007, claimant reported to Mixon that she was "still getting up at least 5 times a night with difficulty sleeping" and that she continued to suffer from anxiety.  (Tr. at 288).  During this appointment, claimant was advised that her prescriptions for Lortab and Clonazepam could no longer be refilled, but she was prescribed Celexa in an attempt to manage her anxiety symptoms better than Wellbutrin.  (Id.).  Claimant saw Dr. R. Carter on August 13, 2007, at which time it

---

[9] On June 7, 2007, claimant underwent reconstructive surgery of the left inframammary fold, which she tolerated well.  (Tr. at 282-83).

was noted that she was doing well, that her mass on her breast had resolved, and that she looked great.  (Tr. at 409-11).

On October 29, 2007, claimant sought treatment from Samuel Church, M.D. ("Dr. Church"), for her mixed hyperlipidemia.  (Tr. at 331-32).  During this appointment, claimant reported suffering from muscle pain and depression and upon physical examination, mild pedal edema and joint stiffness were observed. (Tr. at 331, 333).  Claimant was assessed with mixed hyperlipidemia, osteoporosis, and vitamin B-12 deficiency, and further lab tests were ordered.  (Tr. at 331, 333-34).

Claimant returned to see Dr. R. Carter on November 12, 2007, at which time she reported "doing pretty well," though she had some joint stiffness and pain.  (Tr. at 412-14).  Dr. R. Carter also noted that claimant was suffering from intermittent insomnia as well as fatigue.  (Tr. at 414).  On November 16, 2007, claimant saw Dr. Church for a follow-up appointment regarding her anemia.  (Tr. at 335-37).  During this appointment, it was noted that claimant did not have any suicidal ideations, but that her depressive symptoms were getting worse since her cancer treatment.  (Tr. at 335).  Claimant was observed to have mild pedal edema and joint stiffness, and Dr. Church assessed her with major depression, single episode as well as anemia, mixed hyperlipidemia, and osteoporosis and he ordered a psychiatric diagnostic interview examination.  (Tr. at 335-36).

14

On December 3, 2007, claimant saw Dr. Church for a routine follow up and it was noted that she had suffered from depression for years, but that her medication was not helping. (Tr. at 338-40). Claimant was still suffering from mild pedal edema and joint stiffness and Dr. Church provided claimant with samples of Lexapro to try to manage her depressive disorder. (Tr. at 338, 340). Claimant returned to Dr. Church on January 15, 2008, for refills of her medications and she was noted as being positive for moderate fatigue, edema in her hands, and body aches. (Tr. at 341-43). At this time, claimant reported that Lexapro provided her with no relief and she was given samples of Effexor. (Tr. at 343). Dr. Church administered claimant a B-12 injection on January 29, 2008, at which time claimant reported that she was hurting all over due to Arimidex and needed something to help manage her pain. (Tr. at 344-45).

On February 11, 2008, claimant saw Dr. R. Carter for a follow-up appointment for her breast cancer at which time it was noted that claimant had been doing well on Arimidex since November of 2004 and that she would complete her therapy in November of 2009. (Tr. at 415-17). Dr. Church administered claimant a B-12 injection on March 18, 2008, see (Tr. at 346-47), and on March 31, 2008, claimant reported suffering from arm and limb pain, which she rated an eight in intensity,

(Tr. at 348-50).[10] On June 11, 2008, claimant returned to Dr. R. Carter for a follow-up appointment, at which time she reported no change in her overall status and that she was still suffering from joint pain.[11] (Tr. at 418-20).

On July 18, 2008, claimant sought treatment from Sheryl L. Canady, M.D. ("Dr. Canady"), after relocating to Conyers, Georgia, and needing her medications refilled. (Tr. at 441). Claimant reported suffering from chronic pain, which was noted as possible fibromyalgia, and depression and anxiety. (Id.). Claimant obtained refills of her prescriptions from Dr. Canady on August 18, September 16, and October 20, 2008, see (Tr. at 440), and on September 10, 2008, she reported to Dr. R. Carter that she was tolerating Arimidex well and denied any pain, (Tr. at 472-74).

On September 15, 2008, Richard Hardin Johnson, M.D. ("Dr. Johnson"), a disability determination services ("DDS") non-examining medical consultant,

_____

[10] On April 25, 2008, Dr. Church wrote a "To Whom It May Concern" letter in which he stated in relevant part:

> As a patient in our office, we have been following and treating [claimant] for her health needs. She suffers from pain as a complication of her breast cancer and current medications. She states that the related pain is limiting her ability to work for long periods. As a result, at this time she is unemployed.

(Tr. at 359).

[11] Imaging dated June 3, 2008, confirmed a diagnosis of osteopenia, (Tr. at 260), and a routine mammography on the same date yielded benign findings, (Tr. at 261); see also (Tr. at 418).

completed a case analysis in which he found that claimant's breast cancer and fibromyalgia were non-restrictive and non-severe. (Tr. at 423). On the following day, September 16, 2008, Michael Carter, Ph.D. ("Dr. M. Carter"), another DDS non-examining psychological consultant, evaluated claimant using a Psychiatric Review Technique ("PRT") form for affective and anxiety-related disorders. (Tr. at 424-37). Dr. M. Carter found that claimant suffered from depression and anxiety, (Tr. at 427, 429), but that these impairments were non-severe, (Tr. at 424). He concluded that claimant had mild restrictions in daily living activities; in maintaining social functioning; and in maintaining concentration, persistence, or pace; and that she had no episodes of decompensation, each of an extended duration,[12] (Tr. at 434). He also found that the evidence did not establish the

---

[12] The Listing of Impairments consists of three sets of "criteria"– the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). Fenker v. Astrue, Cause No. 1:08-CV-231-TS, 2010 WL 406061, at *3 n.1 (N.D. Ind. Jan. 25, 2010). "The paragraph A criteria substantiate medically the presence of a particular mental disorder." Id. "The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform substantial gainful activity." Id.; see also 20 C.F.R. §§ 416.920(a)(4)(ii), (iii), (c), (d), and 416.920a(d)(1), (2). There are four broad areas in which the SSA rates the degree of functional limitation: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). The SSA rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 416.920a(c)(4). The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. Id. The last point on

presence of the "C" criteria.  (Tr. at 435).[13]

On December 10, 2008, claimant saw Dr. R. Carter for a follow-up examination of her breast cancer and she reported that she was doing well and had no complaints at that time.  (Tr. at 477-80).  Dr. R. Carter noted that claimant would continue hormonal therapy until 2010 and instructed her to follow up in six months or as necessary.  (Tr. at 479).  On January 13, 2009, claimant returned to Dr. Canady's office and complained of headaches, ringing in her ears, and swelling in her hands, among other things. (Tr. at 439).  Dr. Canady adjusted claimant's medicinal regimen and referred her to an ENT.[14]  (Id.).  Claimant had a follow-up appointment with Dr. Canady on February 23, 2009, see (Tr. at 438), and on March 18, 2009, Dr. Canady

_____

each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.  Id.  Certain Listings may also be met if the claimant has marked limitations in two areas or has experienced repeated episodes of decompensation, each of an extended duration.  See, e.g., 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.  If the claimant's severe mental impairment does not meet or equal a Listing, the ALJ must assess the claimant's mental RFC.  20 C.F.R. § 416.920a(d)(3).

[13] As a basis for his findings, Dr. M. Carter noted that claimant reported no psychiatric treatment other than by her regular treating physicians and that her activities of daily living appeared to be "mainly limited due to physical allegations."  (Tr. at 436).

[14] On February 25, 2009, claimant sought treatment from Ear, Nose & Throat Specialists, LLC, at which time an audiogram was performed, which showed that she had mild mixed hearing loss in her right ear and mild to moderate mixed hearing loss in her left ear.  (Tr. at 464).

contacted claimant's attorney and advised him that she did not perform functional capacity exams, see (id.).

On May 7, 2009, Ramona Minnis, M.D. ("Dr. Minnis"), a DDS non-examining medical consultant, completed a physical RFC assessment of claimant. (Tr. at 456-63). Dr. Minnis' primary diagnoses were fibromyalgia and history of breast cancer, (Tr. at 456), and she opined that claimant could sit, stand, and walk for about six hours in an eight-hour workday, (Tr. at 457). She also opined that claimant could lift or carry 50 pounds occasionally, 25 pounds frequently, and had no limitations for pushing or pulling, except as shown for lifting and carrying. (Id.). Dr. Minnis further found that claimant had postural limitations in that she should only frequently climb, balance, stoop, kneel, crouch, or crawl, but that she had no manipulative, visual, communicative, or environmental limitations. (Tr. at 458-60). Finally, in reaching these findings, Dr. Minnis noted claimant's history of breast cancer, fibromyalgia, high cholesterol, back pain, and damaged hearing, (Tr. at 457-58), but she observed that claimant's spine and musculoskeletal systems were normal, except for slight edema of her fingers, that her osteoporosis was stable with medication, and that claimant did not seem to be significantly limited, (Tr. at 461). Therefore, Dr. Minnis found claimant was only partially credible. (Id.).

19

On the same day, May 7, 2009, Linda O'Neil, Ph.D. ("Dr. O'Neil"), another DDS non-examining psychological consultant, evaluated claimant using a PRT form for affective and anxiety-related disorders.  (Tr. at 442-55).  Dr. O'Neil found that claimant suffered from depression and anxiety, (Tr. at 445, 447), but that these impairments were not severe and co-existed with non-mental impairments that required referral to another medical specialty, (Tr. at 442).  Dr. O'Neil concluded that claimant had mild restrictions in daily living activities; in maintaining social functioning; and in maintaining concentration, persistence, or pace; and that there was insufficient evidence to determine whether she had any episodes of decompensation, each of an extended duration, (Tr. at 452).  She also found that the evidence did not establish the presence of the "C" criteria.  (Tr. at 453).[15]

On June 10, 2009, claimant saw Dr. R. Carter for a follow-up examination, at which time she reported that she was doing well and that she had no complaints.  (Tr. at 475-77).  During this appointment, Dr. R. Carter advised claimant not to engage in any physically strenuous activity, but noted that she was ambulatory and able to carry out light or sedentary work.  (Tr. at 476).  On July 13, 2009, claimant

---

[15] As a basis for her findings, Dr. O'Neil noted claimant's activities of daily living, that she had no psychiatric hospitalizations, that she did not see a mental health professional, and that her limitations "seem to be due to physical."  (Tr. at 454).  Dr. O'Neil found that claimant's symptoms were partially credible, but that they were non-severe.  (Id.).

saw Dr. Canady for a follow-up appointment, at which time she reported that she needed a different medication for her depression as her symptoms were getting worse. (Tr. at 498). Dr. Canady noted that she believed claimant's pain was real and compounded by her depression and anxiety. (Id.). On October 6, 2009, Dr. Canady changed claimant's depression medication since the one prescribed was not covered by claimant's insurance, (Tr. at 497), but after claimant advised Dr. Canady that the new medication was not helping, Dr. Canady changed it on November 12 and again on November 16, 2009, see (id.).

During her follow up appointment with Dr. R. Carter on December 9, 2009, claimant reported doing well and Dr. R. Carter explained that she had completed her five years of hormonal therapy. (Tr. at 481-83). At this time, Dr. R. Carter assessed claimant as remaining in complete remission and he instructed her to follow up in six months. (Tr. at 482). Dr. Canady refilled claimant's medications on February 15 and February 25, 2010, see (Tr. at 496), and on April 13, 2010, claimant saw Dr. R. Carter for a follow-up appointment, at which time she reported that she was doing well, (Tr. at 485-88).

On July 12, 2010, Kathryn Haigh ("Haigh"), a DDS examiner, completed a Report of Contact in which she noted claimant's allegations of breast cancer, fibromyalgia, and depression and that her records also showed a history of

osteopenia.  (Tr. at 208).  Haigh summarized the medical evidence, including that claimant had undergone a mastectomy in July of 2004; that she had some fibrocystic changes in her right breast in August of 2005; that she had chronic pain secondary to Femara therapy in December of 2006; that her TRAM reconstruction was completed in June of 2007; that a follow-up mammogram was negative in June of 2008; and that she had some joint pain but an otherwise normal physical exam in June of 2009, and found that the "[b]ody of evidence describe[d] a remote history of breast cancer without recurrence" and that her physical impairments were "most consistent with [the] initial nonsevere assessment." (Id.).  With regard to claimant's depression, Haigh stated, "please order a psych CE to address brief mentions of anxiety & depression in file.  She does take psych meds, but there is no description of how these impairments impact [claimant's] ability to function, as there are no psych evals or therapy notes in file."  (Id.).

On July 16, 2010, claimant saw Dr. R. Carter for a follow-up appointment, at which time she voiced no complaints, (Tr. at 484-85); however, on August 3, 2010, she reported to Dr. R. Carter that she had a new mass in her right breast and a biopsy was ordered, see (Tr. at 489-91).  On September 7, 2010, Dr. R. Carter noted

22

that the biopsy of the mass was negative and that it was possibly an old hematoma. (Tr. at 492).[16]

### C.   Third-Party Adult Function Reports

On August 14, 2008, Margaret Shaw ("Shaw"), claimant's mother, completed a Third-Party Adult Function Report in which she explained that claimant lived alone in her house, that she spent about four to five hours per day with claimant, and that claimant usually sat around the house in pain most of the day either watching television or reading. (Tr. at 140, 144). Shaw also explained that claimant was only able to sleep about three to four hours per night due to her pain. (Tr. at 141). Shaw further explained that claimant had difficulty with her personal care due to the pain in her back, arms, and legs. (Id.). However, Shaw marked that claimant did not need any special reminders to take care of her personal needs and did not need help or reminders to take her medications. (Tr. at 142). As for meal preparation, Shaw reported that claimant did not cook and that she primarily ate sandwiches and snacks. (Id.). She also reported that claimant did the laundry if she

---

[16] The eCAR also contains an undated medication list in which claimant detailed her current medications and then noted that her depression medication had been changed many times over the years, but that since she had started taking Citalopram, she had not tried to or thought about killing herself any more. (Tr. at 466).

felt able to, but that she had to work at her own pace, and that she did not do any yard work.  (Id.).

Shaw reported that claimant did not go outside often, but that she could drive a car and ride in a car, and that she could go out alone.  (Tr. at 143).  She also reported that claimant would talk to people on the telephone, but that she did not like being around people and kept to herself.  (Tr. at 144-45).  She further reported that claimant shopped once a month and that it usually took her several hours to grocery shop.  (Tr. at 143).  Shaw opined that claimant's alleged conditions, including body pain, affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, use her hands, and to get along with others and caused her to depend on arm braces and a back brace.  (Tr. at 145-46).  Shaw opined that claimant had difficulty dealing with stress and that she stayed depressed and worried all of the time.  (Tr. at 146).  Finally, Shaw remarked:

> [Claimant] is not the same person she use [sic] to be.  Her illness has caused her much pain, depression, and worry.  She is no longer able to do things as she did prior to her illness.  She is withdrawn from family and friends.  She is limited as to what she can do, and her quality of life has gone down hill.  She is not able to enjoy many things in life due to her pain.

(Tr. at 147).

On February 27, 2009, Shaw completed another Third-Party Adult Function Report in which she explained that claimant now lived in a trailer with her

24

daughter, that she did not do much of anything, and that her daily routine depended on how she was feeling that day. (Tr. at 177). Shaw also explained that claimant did not get much sleep at night, that she had trouble taking care of her personal needs due to her pain, that most of the time she did not need a reminder to take care of her personal needs but that she needed help, and that she sometimes needed reminders to take her medications. (Tr. at 178-79). She reiterated that claimant only prepared frozen meals or sandwiches and added that claimant had trouble opening jars and containers. (Tr. at 179). She also reiterated that claimant did not perform any house or yard work and that she went outside "maybe" once a day. (Tr. at 179-80). Shaw marked that claimant could ride in a car and that either she or claimant's daughter accompanied her since her pain and medications prevented her from being able to drive. (Tr. at 180). Shaw also reported that claimant no longer did any of the shopping, (id.), that she still watched television and read most of the day, that she had no social life, and that she only went to the doctor on a regular basis, (Tr. at 181-82).

Shaw concluded that claimant's alleged conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, hear, remember, complete tasks, concentrate, understand, use her hands, and to get along with others and

caused her to depend on arm braces and a back brace.  (Tr. at 182-83).  Shaw also

reiterated that claimant was depressed "a lot," (Tr. at 183), and remarked:

> Since her illness, [claimant's] overall health has went down hill.  She is
> not able to do anything that she use [sic] to.  She suffers from
> depression, and she has become very withdrawn from her family.  Her
> illness, chemo, and other treatments have diminished her quality of
> life[.] [Claimant] just recently found out from her doctor that she has
> damage to her ear drums from the chemo, which causes hearing loss.
> Everyday for [claimant] is a struggle.  Simple tasks such as sitting,
> walking, lifting and standing are extremely difficult for her.  She is not
> the same person she once was.

(Tr. at 184).

## D.   **Administrative Hearing**

### 1.   *Claimant's Testimony*

At the hearing held on October 7, 2010, claimant appeared with counsel and

testified that she was 51 years old, that she was separated from her husband, and

that she lived with her 31 year old daughter in a mobile home.  (Tr. at 27, 29, 34).

Claimant stated that she had a valid driver's license, but that she believed it was too

dangerous for her to drive due to her medications, including her antidepressant and

narcotic medications, and that her mother drove her to the hearing.  (Tr. at 34-35).

She also testified that she had a ninth grade education, that she did not obtain a

General Educational Development certificate, and that she had never had any sort

of vocational training. (Tr. at 36). Claimant explained that she had not worked since 2008 and that her daughter supported her and covered all of her expenses. (Id.).

With regard to the last job claimant held, which was from sometime in 2006 through April of 2008, she testified that she could no longer perform her job duties as a prep cook and dishwasher due to the pain in her arms, her inability to lift objects, and the swelling in her back and legs. (Tr. at 36-37). Claimant did not work at all during 2001 through 2006, and she only worked for two days sometime in 2000 for Post Citizen Media handling newspapers, but she could not perform that job due to having to "bend over a lot." (Tr. at 38). Claimant did not work between 1998 and 2000, but she worked from 1995 to 1997 as a waitress for a couple of restaurants. (Tr. at 38-39).

When asked why she believed she could no longer work, claimant explained that her past surgeries, which included a single mastectomy and transabdominal reconstruction due to breast cancer, affected the strength in her arms and caused her bones to ache all the time; that her back, legs, feet, and hands swell; that her mind was not clear and went in circles; and that she suffered from depression. (Tr. at 42-43, 47). Claimant also explained that she suffered from osteoporosis and fibromyalgia in her shoulders, neck, and back, which caused her pain on a daily basis. (Tr. at 43-44). With regard to her mental health issues, claimant testified that

she had not sought mental health counseling, but that she "talked to [her] doctor" about "[e]very three months, and more if [she] need[ed] it." (Tr. at 43). She stated that she had contemplated suicide on one occasion and she contacted her doctor who then changed her medication. (Id.). Claimant also testified that she suffered from ringing in her ears as a result of the chemotherapy. (Tr. at 46).

With regard to her physical and mental abilities, claimant stated that she could only lift a gallon of milk with both hands, which prompted her daughter to start buying half gallons instead. (Tr. at 48-49). Claimant also stated that she had trouble remembering things from the present and that she suffered from fatigue. (Tr. at 49-50). She also stated that the mastectomy caused her to lose feeling in part of her stomach and in her left arm. (Tr. at 50). Claimant stated that on average, her daily pain was around an eight on a scale of one to ten, with ten being the worst. (Tr. at 44). She stated that activities such as walking to the mailbox aggravated her pain. (Tr. at 45). She also stated that she could take a shower on her own, but that it took awhile and that she could prepare simple meals such as sandwiches. (Id.). As for household chores, claimant stated that she could "make up the bed" but "[t]hat's about it," and that her daughter did the grocery shopping as well as shopping for claimant's basic needs. (Tr. at 45-46).

28

As for her current medications, claimant testified that she took a cholesterol medication, a sleep medication, a prescription strength ibuprofen, pain killers, had to be administered B-12 injections, and took medications to treat and manage her osteoporosis, anxiety, depression, and hormones.  (Tr. at 40-41, 50).  Claimant testified that she suffered from side effects as a result of these medications, including drowsiness, swelling, and body aches.  (Tr. at 41-42).  She explained that she only slept for about four hours per night since she was "up and down just about all night long."  (Tr. at 42, 51).  Claimant also explained that she has to use a heating pad several times a day to try to alleviate her pain.  (Tr. at 44, 51).

With regard to her daily activities, claimant testified that she would wake around 7:30 a.m., go into the kitchen, and that her daughter would have the coffee ready.  (Tr. at 46).  She explained that she was basically "just up and down all day long, just walking, pacing back and forth" and that she would try to do some "word finds" puzzles but that her vision made it difficult.  (Id.).  Finally, claimant testified that her mammograms have been clear and that she has had no recurrence of her breast cancer.  (Tr. at 47).

## 2. *Testimony of the Vocational Expert ("VE")*

Vivian Hannah testified as a VE at the hearing.  (Tr. at 52-55).  The VE classified claimant's past work as a prep cook and dishwasher as medium, unskilled

work with a specific vocational preparation ("SVP")[17] of 2, and her past work as a waitress as light, semi-skilled work with an SVP of 3. (Tr. at 52-53). The VE explained that there were no transferable skills for any of these jobs. (Tr. at 53).

The ALJ then posed hypothetical questions to the VE. (Tr. at 53-55). Specifically, the ALJ instructed the VE to assume an individual with the same age, educational background, and work experience as claimant, who is able to work at the light exertional level with a sit/stand option and who can only occasionally reach overhead with the left arm, and asked the VE whether this individual could perform claimant's past work as a waitress, to which the VE responded negatively. (Tr. at 53). The ALJ then asked whether this individual would be able to perform other work, and the VE responded that there were light, unskilled jobs with a sit/stand option that the individual could perform. (Id.). In particular, the VE identified jobs such as a parking lot cashier, a check processor, and an information clerk in business services as work the individual could perform. (Id.).

---

[17] Social Security Ruling ("SSR") 00-4p discusses the relationship between SVP time and the skill level definitions set forth in the regulations, and explains that "unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the [Dictionary of Occupational Titles]." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). SSRs "'are binding on all components of the [SSA].'" Brewer v. Astrue, No. 8:09-CV-132-T-27TGW, 2010 WL 454916, at *1 n.1 (M.D. Fla. Feb. 9, 2010) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 n.9 (1990); 20 C.F.R. § 402.35(b)(1)). "Although SSRs do not have the force of law, they are entitled to deference if consistent with the Social Security Act and regulations." Id. (citation omitted).

The ALJ then directed the VE to assume the same hypothetical individual as before, but with the additional limitations of being able to only occasionally stoop, crouch, kneel, or crawl; no climbing ladders, ropes, or scaffolds; and limited to unskilled work that is "simple, routine and repetitive in nature with no fast-paced production requirements," and asked if this individual would be able to perform the jobs previously identified by the VE.  (Tr. at 53-54).  The VE responded that the additional limitations would not eliminate any of the jobs she previously identified that the individual could perform.  (Tr. at 54).

The ALJ then directed the VE to assume a hypothetical individual with the same age, educational background, and work experience as claimant, who is able to work at the light exertional level with the same limitations as before, but with the added additional limitations of doctor's visits at the frequency of once every three months and a job that would also require repeated instruction on an as-needed basis and a verbal check-in with repeated instructions by a supervisor, and then asked the VE whether this individual could still perform those jobs she previously identified. (Id.).  The VE responded that such additional limitations would change her opinion by eliminating all jobs because "[i]n simple unskilled work or most competitive

employment, repeated oversight by a supervisor should not be necessary."[18] (Tr. at 54-55).

Claimant's attorney then asked the VE whether an individual with a pain level of eight would have problems with concentration in the jobs she previously identified. (Tr. at 55). The VE replied, "it would be reasonable to expect that this would interfere with that ability to pay attention to the task at hand" and that "it would eliminate the proper performance of the job" such that the individual "would not be expected to maintain employment." (Id.).

E.    **ALJ and Appeals Council**

1.    *Findings of the ALJ*

By decision dated October 21, 2010, the ALJ denied claimant's application for SSI. (Tr. at 10-26). Specifically, the ALJ made the following findings of fact:

1.    The claimant has not engaged in substantial gainful activity since July 18, 2008, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: status-post breast cancer and left mastectomy; hearing loss in her left ear; and depression (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

---

[18] The VE testified that the "frequency of the doctor's visits is acceptable within the unskilled level." (Tr. at 55).

4.     After careful consideration of the entire record, I find that the claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b) except that she must have the option to alternate sitting and standing, as needed, with only occasional overhead reaching with the left arm and only occasional stooping, crouching, kneeling, and crawling; no climbing of ladders, ropes, or scaffolds; unskilled work that is simple, routine and repetitive in nature with no fast-paced production requirements.

5.     The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.     The claimant was born on April 17, 1959, and was 49 years old, which is defined as a "younger person," on the date the application was filed; she is now 51 years old, which is defined as an individual "closely approaching advanced age" (20 CFR 416.963).

7.     The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.    The claimant has not been under a disability, as defined in [the Act], since July 18, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. at 15-22).

2.   *Appeals Council Decision*

Claimant requested a review of the ALJ's hearing decision, see (Tr. at 8-9), and she submitted a brief from her representative,[19] which the Appeals Council made a part of the record, (Tr. at 5-6). On July 14, 2012, the Appeals Council denied claimant's request for review, concluding that the information provided by claimant "does not provide a basis for changing the [ALJ's] decision." (Tr. at 1-4).

## IV. <u>STANDARD FOR DETERMINING DISABILITY</u>

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); see also Majkut v. Comm'r of Soc. Sec., 394 F. App'x 660, 662 (11th Cir. 2010) (per curiam) (unpublished) (citations and

---

[19] "This Court must consider evidence not submitted to the ALJ but considered by the Appeals Council in reviewing the administrative decision." <u>Tyson v. Comm'r of Soc. Sec.</u>, No. 6:10–cv–536–Orl–DAB, 2011 WL 1326833, at *3 (M.D. Fla. Apr. 6, 2011) (<u>citing Ingram v. Comm'r of Soc. Sec.</u>, 496 F.3d 1253, 1258 (11th Cir. 2007)); <u>see also Allen v. Astrue</u>, No. 3:11–CV–92–CAR–MSH, 2012 WL 892275, at *4 (M.D. Ga. Feb. 14, 2012), adopted by 2012 WL 892273, at *1 (M.D. Ga. Mar. 14, 2012) (citation omitted). Indeed, "[i]t is incumbent upon the Court to evaluate the record as a whole to determine whether substantial evidence supports the ALJ's decision and to determine whether the Appeals Council properly denied [claimant's] request for review because the ALJ's decision was not contrary to the 'weight of the evidence currently of record.'" <u>Tyson</u>, 2011 WL 1326833, at *3 (<u>quoting Ingram</u>, 496 F.3d at 1261).

internal marks omitted).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B), (D); D'Andrea v. Comm'r of Soc. Sec. Admin., 389 F. App'x 944, 945 (11th Cir. 2010) (per curiam) (unpublished).

"The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner."  Gibson v. Astrue, Civil Action File No. 1:09-CV-677-AJB, 2010 WL 3655857, at *7 (N.D. Ga. Sept. 13, 2010).  "The claimant bears the primary burden of establishing the existence of a 'disability' and therefore entitlement to disability benefits."  Id. (citation omitted); see also 20 C.F.R. § 416.912(a).  The Commissioner utilizes a five-step sequential analysis to determine whether the claimant has met the burden of proving disability.  See Manzo v. Comm'r of Soc. Sec., 408 F. App'x 265, 266 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted); Brooks v. Barnhart, 133 F. App'x 669, 670 (11th Cir. 2005) (per curiam) (unpublished) (citation omitted); Doughty v. Apfel, 245 F.3d

1274, 1278 (11th Cir. 2001) (citations omitted); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999) (citation omitted); 20 C.F.R. § 416.920(a)(4).

Claimant must prove at step one that she is not undertaking substantial gainful activity.  See Manzo, 408 F. App'x at 266 (citations omitted); 20 C.F.R. § 416.920(a)(4)(i).  At step two, claimant must prove that she is suffering from a severe impairment or combination of impairments which significantly limits her ability to perform basic work-related activities.  See Manzo, 408 F. App'x at 266 (citations omitted); 20 C.F.R. § 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 [Listing of Impairments], claimant will be considered disabled without consideration of age, education and work experience.  See Salazar v. Comm'r of Soc. Sec., 372 F. App'x 64, 66 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted); 20 C.F.R. § 416.920(a)(4)(iii).  At step four, if claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work.  See D'Andrea, 389 F. App'x at 945 (citation omitted); 20 C.F.R. § 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider claimant's RFC, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work.  See Manzo, 408 F.

App'x at 267 (citations omitted); 20 C.F.R. § 416.920(a)(4)(v).[20]  The Commissioner must produce evidence that there is other work available in the national economy that claimant has the capacity to perform.  In order to be considered disabled, claimant must prove an inability to perform the jobs that the Commissioner lists. Doughty, 245 F.3d at 1278 n.2 (citation omitted).

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. § 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests upon claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  Doughty, 245 F.3d at 1278 & n.2.

## V.  SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited.  Lynch v. Astrue, 358 F. App'x 83, 86 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted).  "Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were

---

[20] As explained by Doughty, the temporary shifting of the burden at step five to the Commissioner is a creature of judicial gloss on the Act and not mandated by the statutes.  245 F.3d at 1278 n.2 (citation omitted); see also Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995) (per curiam) (citation omitted) ("Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do.").  "Until step five is reached, the burden is on the claimant to introduce evidence in support of her application for benefits."  Salazar, 372 F. App'x at 66 (citation omitted).

applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues." <u>Russell v. Astrue</u>, 742 F. Supp. 2d 1355, 1367 (N.D. Ga. 2010) (<u>citing</u> <u>Fields v. Harris</u>, 498 F. Supp. 478, 488 (N.D. Ga. 1980)). "This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner." <u>Id.</u>; <u>see also</u> <u>Lynch</u>, 358 F. App'x at 86 (citations omitted); <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam) (citation omitted); <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (citation omitted). If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. <u>See</u> <u>Dyer</u>, 395 F.3d at 1210; <u>Phillips</u>, 357 F.3d at 1240 n.8; <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997); <u>Graham v. Apfel</u>, 129 F.3d 1420, 1422 (11th Cir. 1997) (per curiam) (citations omitted) (<u>quoting</u> 42 U.S.C. § 405(g)); <u>Foote</u>, 67 F.3d at 1560 (<u>citing</u> 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Somogy v. Comm'r of Soc. Sec.</u>, 366 F. App'x 56, 62 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted); <u>see also</u> <u>Strickland v. Comm'r of Soc. Sec.</u>, No. 12–15355, 2013 WL 1482741, at *1 (11th Cir. Apr. 11, 2013) (per curiam) (unpublished) (citation and internal marks omitted). In considering the evidence in

the record, this Court must consider the record as a whole.  <u>Lynch</u>, 358 F. App'x at 86.  It may not affirm the Commissioner's decision by referring only to those parts of the record which support the same conclusion.  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983) (per curiam).  That is, "the Commissioner's findings of fact must be grounded in the entire record; a decision that focuses on one aspect of the evidence and disregards other contrary evidence is not based upon substantial evidence."  <u>Wooten v. Astrue</u>, No. CV 309-023, 2010 WL 2521047, at *2 (S.D. Ga. May 26, 2010), adopted by 2010 WL 2521045, at *1 (S.D. Ga. June 21, 2010) (citation omitted).  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951).

However, if the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the evidence preponderates against the Commissioner's decision.  <u>Dyer</u>, 395 F.3d at 1210 (citation omitted); <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam) (citation omitted); <u>Ellison v. Barnhart</u>, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) (citation omitted); <u>Miles v. Chater</u>, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam) (citation omitted).  "In contrast, review of the ALJ's application of legal principles is plenary."  <u>Bailey v. Astrue</u>, 739 F. Supp. 2d 1365, 1376 (N.D. Ga. 2010) (<u>citing</u>

39

<u>Foote</u>, 67 F.3d at 1558; <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam)).

## VI.  <u>ANALYSIS OF CASE</u>

While claimant has identified several issues on which she contends the ALJ erred, <u>see</u> [Doc. 8], the Court will first address her claim regarding the ALJ's failure to fully and fairly develop the record by obtaining a consultative psychiatric examination as the Court finds that the ALJ's decision in this regard is not supported by substantial evidence and the error impacts other issues raised by claimant.

A consultative examination is required "when the evidence as a whole is insufficient to support a determination or decision on [a] claim," such as where the "additional evidence needed is not contained in the records," among other things. 20 C.F.R. § 416.919a(b).   In other words, an ALJ is not required to order a consultative examination unless "such an evaluation is necessary for [her] to make an informed decision."  <u>Reeves v. Heckler</u>, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (per curiam) (<u>citing</u> <u>Ford v. Sec'y of Health & Human Servs.</u>, 659 F.2d 66, 69 (5th Cir. Unit B Oct. 1981)[21]).   However, "the ALJ is charged with developing a fair and full record," and "[t]his obligation exists whether or not the claimant is represented by

---

[21] In <u>Stein v. Reynolds Securities, Inc.</u>, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit.

counsel." <u>Smith</u>, 792 F.2d at 1551 (citations omitted). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. . . ." <u>Smith v. Astrue</u>, No. 4:10cv472–MP/WCS, 2011 WL 5026218, at *16 (N.D. Fla. Sept. 16, 2011), adopted by 2011 WL 5026212, at *1 (N.D. Fla. Oct. 21, 2011) (alteration in original) (citation and internal marks omitted). "The responsibility to see that this duty is fulfilled belongs entirely to the ALJ; it is not part of the claimant's burden," <u>Smith v. Astrue</u>, No. ED CV 08–1131–PLA, 2009 WL 1653032, at * (C.D. Cal. June 10, 2009) (citation omitted), and the Eleventh Circuit "has remanded cases to the ALJ for the express purpose of obtaining a psychiatric examination," <u>Smith</u>, 792 F.2d at 1551 (citations omitted).

There are several entries in the medical records noting that claimant suffers from depression and anxiety, <u>see</u> (Tr. at 288, 293-94, 296-97, 299, 301, 307, 309, 328, 331, 333, 335-36, 338-43, 441, 466, 497-98), and although two state agency non-examining psychological consultants found claimant suffered from depression and anxiety but that these impairments were non-severe in September of 2008 and May of 2009, <u>see</u> (Tr. at 424-37, 442-55), the ALJ found claimant's depression to be a severe impairment and assessed mental restrictions, <u>see</u> (Tr. at 15, 17). Therefore, the ALJ concluded, contrary to the opinions of the state agency psychological consultants, that claimant's depression was a severe impairment that "significantly

limits [her] ability to perform basic work activities." (Tr. at 14-15); see also Holmes v. Astrue, No. CIV–11–838–W, 2012 WL 1371400, at *3 (W.D. Okla. Mar. 29, 2012), adopted by 2012 WL 1377609, at *1 (W.D. Okla. Apr. 19, 2012). However, there is no record of any consultative examination to assess whether claimant's mental condition was in fact causing any work-related limitations and if so, what those limitations were, and "[b]ecause . . . the State agency medical expert[s] found [claimant's] mental impairments to be non-severe, the record had not been developed as to [claimant's] capabilities in light of this impairment." Holmes, 2012 WL 1371400, at *3.

While the ALJ assessed mental restrictions in claimant's RFC, (Tr. at 17), her "decision does not reveal the support for such restrictions," Holmes, 2012 WL 1371400, at *3. Indeed, in reaching her decision regarding claimant's mental impairments, the ALJ stated in relevant part as follows:

> With regard to the claimant's history of depression, the medical evidence of record indicates that she has taken a variety of medications including Paxil, Zoloft, Wellbutrin, Effexor and Celexa to control her depressive symptoms. [Dr. Church], one of claimant's treating physicians, noted that she had a single episode of major depression in 2007. Further, the claimant sees another physician, [Dr. Canady], to follow up on her prescription refills. However, treatment records indicate that the claimant's depression is stable and controlled by medication. The objective medical evidence does not show that the claimant has sought in/out patient treatment for her depression, nor has she been hospitalized for psychiatric treatment. The claimant testified at the hearing that she talks to "her doctor" every three

> months; however, the record does not indicate that she has sought treatment from a licensed psychologist or psychiatrist.
>
> . . .
>
> Further, I considered the claimant's testimony that she is depressed and worried and has trouble with her memory and concentration. In that regard, the evidence does not show that her depression/anxiety is so severe that it would be expected to cause or result in more than mild limitations on concentration with the performance of the modest exertional requirements of light work, especially if she performs routine, repetitive, and simple work with no fast-paced requirements. Moreover, her allegations of such limitations are not considered credible in light of the evidence showing that her depression is stable and controlled by medication.

(Tr. at 18-19). Although the record does not reflect that the claimant sought any mental health treatment from a licensed psychologist or psychiatrist, the ALJ's statement that her depression was stable and controlled by medication overlooks the fact that those records were from claimant's treatment at the Hayesville Family Practice prior to her alleged onset date of April 1, 2008, see (Tr. at 296, 307, 309), but subsequent records show that claimant's depression and anxiety were worse and that she was constantly changing her medications in an attempt to manage those symptoms, see (Tr. at 441, 497-98). Viewing the entire medical record, and in light of the fact that there is no consultative examination in the record, it is unclear how the ALJ arrived to her RFC assessment of claimant's mental limitations.

Furthermore, a DDS examiner even noted in July of 2010, that claimant's records mention anxiety and depression, that claimant took psychiatric medications,

but that there was "no description of how these impairments impact[ed claimant's] ability to function," and she asked that a consultative psychiatric examination be ordered to address this deficiency in the record. (Tr. at 208). Here, "[t]he ALJ obviously believed that [claimant's] condition had changed since the State agency psychological expert[s] reviewed her file; [s]he found her to be severely impaired by depression, but not anxiety, and assessed mental restrictions." Holmes, 2012 WL 1371400, at *3. However, the ALJ did so "without developing the record and obtaining a consultative mental status examination of [claimant] in order to secure a mental health professional's opinion of [claimant's] capabilities, capabilities which could potentially vary from those assessed by the ALJ in the absence of any such evidence." Id. "The ALJ found substantial evidence on the record as a whole to determine that [claimant] suffered from depression, yet the record is significantly lacking in any evidence as to the effect of [claimant's] depression and anxiety on her RFC in light of her social and daily functioning capacities as well as her concentration, pace, and persistence as required by [§ 416.920a(d)(1)]," and the "sporadic, superficial, vague references to [claimant's] depression did not provide an adequate basis from which the ALJ could determine the severity of [claimant's] depression." Merdan v. Astrue, No. 10–CV–2376 MJD/SER, 2011 WL 3555428, at *15 (D. Minn. July 22, 2011), adopted by 2011 WL 3555425, at *2 (D. Minn. Aug. 11, 2011). Therefore, the ALJ's "determination as to the severity of [claimant's] depression and

44

its effect on [claimant's] RFC lacks substantial evidence on the record as a whole, causing prejudice to [claimant]." Id.

"The court recognizes that the mere fact of claimant's injuries is not enough, standing alone, to establish claimant's disability. Instead, the relevant consideration is the effect of the injuries, or the combination of impairments resulting therefrom, on the claimant's ability to perform substantial gainful work activities," and the record here "simply does not contain sufficient medical information to determine the extent of those limitations." Hall v. Astrue, No. CV–11–S–3540–J, 2012 WL 2499177, at *3 (N.D. Ala. June 22, 2012) (citations omitted). "A reliable [RFC] assessment must be based on *specific* medical evidence." Lambert v. Astrue, Civil Action No. 08–657, 2009 WL 425603, at *17 (W.D. Pa. Feb. 19, 2009) (citation omitted); see also Dillard v. Astrue, 834 F. Supp. 2d 1325, 1332-33 (S.D. Ala. 2011) (citation omitted) ("While the ALJ admittedly has the responsibility of determining a claimant's RFC, there must be substantial support in the record for that determination and it has always been the view of this Court, and will continue to be the view of this Court, that substantial evidence in support of such RFC determination necessarily must include an RFC assessment by a treating or examining physician. Without such evidence, all this Court perceives is mere conjecture and intuition by the ALJ. . . .").

Considering the amount of evidence in the record pointing to the fact that claimant suffered from depression and anxiety and the absence of anything in the record from which the ALJ might reasonably discern what the functional limitations caused by any such conditions were, the ALJ erred by not ordering a consultative examination to establish the severity and limiting effects of those conditions.  See Rease v. Barnhart, 422 F. Supp. 2d 1334, 1375 (N.D. Ga. 2006) (remand warranted where ALJ did not fully and fairly develop the record by ordering a consultative exam addressing the limitations caused by all of claimant's mental health conditions evident in the record); Pelt v. Barnhart 355 F. Supp.2d 1288, 1291 (N.D. Ala. 2005) ("[A] consultative mental evaluation was required for an informed decision because the extensive treatment notes for depression are insufficient to establish the vocational impact of the plaintiff's mental impairment on her ability to work."). Thus, it is recommended that the ALJ be directed upon remand to order the necessary consultative examination to determine the severity of and what, if any, work-related limitations are caused by claimant's mental impairments.[22]

---

[22] Because it is recommended that this case be remanded for further proceedings that could impact the ALJ's assessment of claimant and Shaw's credibility, her RFC, and her ability to perform other work in the national economy, the Court need not address the remaining issues raised by the claimant.  Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (declining to address claimant's remaining arguments where remand was warranted on other grounds); see also Hall, 2012 WL 2499177, at *4 n.8; Rouse v. Astrue, No. 8:08-cv-2281-T-23TBM, 2010 WL 457320, at *8 (M.D. Fla. Feb. 4, 2010) (footnote and citation omitted). Additionally, in recommending that this case be remanded for further proceedings,

## VII.  <u>CONCLUSION</u>

For the reasons stated, it is hereby **RECOMMENDED** that the Commissioner's final decision denying claimant's application for SSI benefits be **REVERSED**, and that this case be **REMANDED** to the Commissioner pursuant to sentence four of § 405(g) for further proceedings.

The Clerk is hereby **DIRECTED** to terminate this reference.

**IT IS SO RECOMMENDED**, this 17th day of May, 2013.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

the Court does not make any findings as to whether the claimant is in fact disabled.